Filed 6/20/14  P. v. Sierra CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C068857 |
| v. | (Super. Ct. No. CM033480) |
| RAMON DANA SIERRA, | |
| Defendant and Appellant. | |

Defendant Ramon Dana Sierra and an accomplice committed a home invasion robbery, binding three victims at gunpoint, beating one of the victims (defendant's relative C.S.), and committing sexual battery against C.S.'s girlfriend.  A jury convicted defendant of assault with a deadly weapon, false imprisonment by violence, dissuading a witness, threatening a witness, assault with a semiautomatic firearm, first degree residential robbery, misdemeanor sexual battery, and possession of a firearm by a felon.

1

The trial court determined defendant had a prior strike conviction and five prior prison sentences and sentenced defendant to 63 years 8 months in prison.

Defendant now contends (1) the prosecutor's belated disclosure of C.S.'s prior police contact and misdemeanor conviction merits a new trial under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*); (2) the trial court erred in denying defendant's request for a continuance to secure the testimony of a witness who had complained to police about C.S. in 2005; (3) the prosecutor committed misconduct by commenting on subjects during closing argument that had been previously precluded by the trial court; (4) the trial court committed instructional error; and (5) the trial court committed sentencing error.

Regarding defendant's first contention, we conclude there was no *Brady* violation because the delayed information was not material exculpatory evidence and there was no suppression because defendant was able to use it at trial to impeach C.S.'s testimony. The trial court adequately addressed the delayed disclosure, and, in any event, there is no reasonable probability of a different result because C.S.'s testimony was corroborated by other witnesses and the physical evidence.

As for defendant's remaining contentions, we conclude the trial court did not abuse its discretion in denying a continuance after the jury had been sworn. In addition, there was no prosecutorial misconduct, because the prosecutor's statements were argument, not testimony, they did not violate the trial court's sanction order, and the prosecutor did not employ deceptive or reprehensible methods. Moreover, the trial court did not commit instructional error because it did not have a sua sponte duty to instruct on unanimity. Finally, the trial court did not commit sentencing error because substantial evidence supports the trial court's implicit finding that each crime was divisible and that stays were not required under Penal Code section 654; and that finding did not constitute error under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*).

Our review of the record also discloses clerical errors in the abstract of judgment that require correction.

We will affirm the judgment and direct the trial court to correct the abstract of judgment.

BACKGROUND

C.S.'s mother helped raise defendant and his siblings, including defendant's brother, Tommy. From about 1998 until 2008, Tommy and C.S. lived together in a home owned by C.S.'s parents. For a period of time in early 2009, defendant lived in the same home with C.S. and C.S.'s girlfriend, S.M.

During defendant's stay with C.S., C.S. had the ability to unlock a gun safe in the home that belonged to C.S.'s father. During the same period, C.S. gave defendant a folding Smith & Wesson knife with the blade marked "SWAT."

Some time before March 2009, Tommy shot C.S. in the stomach and arm. C.S. told police about the shooting. In March 2009, C.S. had surgery to address complications resulting from the gunshot wound. C.S.'s mother told defendant about the surgery.

On the evening of March 24, 2009, C.S. and S.M. were at home. Their friend, Scott, was also there, watching television. C.S. was playing guitar and S.M. was cooking. At around dusk, without knocking, defendant and a man he introduced only as "Bear" unexpectedly entered the home. Defendant stumbled and fell as he entered and S.M. noticed he smelled of alcohol. Defendant and Bear stayed for a period of time C.S. estimated as 45 to 90 minutes.

Defendant and C.S. went to C.S.'s sister's room and discussed defendant's request for a pistol and ammunition. C.S. testified he had loaned a gun to defendant on an earlier occasion; defendant had not returned it. C.S. refused to give him another. Defendant and C.S. returned to the dining room where defendant insisted on C.S. showing Bear a .45-caliber pistol that defendant knew was kept in the locked gun safe. C.S. unlocked the

3

safe to remove the pistol and did not relock it because he intended to put the pistol back; the safe contained several other guns, including pistols, a rifle and an assault weapon.

C.S. removed the ammunition clip from the .45 and handed it to defendant to hold while he stepped into the kitchen to get a bite of the food his girlfriend was cooking. Some seconds later (long enough, C.S. said, for the pistol to have been reloaded), C.S. heard a noise in the living room and returned there to see defendant pointing the pistol at C.S.'s dog and at his friends. C.S. yelled at defendant, "Knock that shit off, these people are not used to that." Defendant did not respond, but Bear put a knife to C.S.'s back and said defendant was not joking and had the ammunition clip. Bear moved the knife to C.S.'s throat and defendant directed Bear to hog-tie C.S. Bear tied C.S.'s hands behind C.S.'s back with a shoelace.

While C.S. was bound and on the ground, Bear punched and kicked C.S., knocking out two teeth, breaking another and knocking loose both upper incisors; Bear then used the SWAT knife C.S. had given defendant to slice C.S.'s nose, mouth and face. Placing the gun against C.S.'s temple, defendant told C.S. the beating was "for ratting on my brother [Tommy]."

C.S. testified that defendant cut an electric cord from an aquarium in the room and used it, along with shoelaces, to "hog tie" S.M. and Scott, binding their hands and feet behind their backs. While all three victims were bound, defendant put his hand inside S.M.'s pants in her crotch area and laughed, then poked her on her back with the gun. Bear removed his penis from his pants and ordered C.S. to suck it but put it away after C.S. protested and defendant told Bear to "zip it up."

One of C.S.'s friends came to the back door; defendant told him the residents had gone to buy beer. Defendant and Bear then took guns and ammunition from the gun safe and placed them in pillow covers and a trash bag.

According to C.S., Bear told Scott he knew where Scott lived and threatened Scott's life if he talked to police. In addition, defendant told C.S. and S.M. that if they

4

told the police about the crimes, defendant would kill C.S.'s mother, sister, five-year-old nephew and S.M. Defendant disabled the telephone. C.S. said Bear pointed a rifle at C.S., held up a bullet and said he "killed people like [C.S.], he kills rats, he's done time in Folsom." As defendant and Bear left, defendant put the pistol to C.S.'s head and said, "The only reason why I'm not killing you is because I love you."

C.S. subsequently reported the crimes to police, but he did not report that S.M. and Scott had been present. He explained at trial that S.M. and Scott initially did not want to be involved but later changed their minds, so he told the police the truth before and during trial.

Additional facts are included in the discussion where relevant to the contentions on appeal.

The jury convicted defendant of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1) -- counts 1, 11);[1] false imprisonment by violence (Pen. Code, § 236 -- counts 2, 9); dissuading a witness (Pen. Code, § 136.1, subd. (b)(2) -- count 3); threatening a witness (Pen. Code, § 140, subd. (a) -- count 4); assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b) -- count 5); first degree residential robbery (Pen. Code, § 211 -- count 6); misdemeanor sexual battery (Pen. Code, § 243.4, subd. (a) -- count 10); and possession of a firearm by a convicted felon (former Pen. Code, § 12021, subd. (a)(1) -- count 12). The jury also found true allegations that defendant personally used a firearm. (Pen. Code, §§ 12022.5, subd. (a) -- counts 2, 5, 9; 12022.53, subd. (b) --count 6.)

The trial court determined defendant had a prior strike conviction and five prior prison sentences and sentenced defendant to 63 years 8 months in prison, consisting of 18 years on count 5 (assault with a semiautomatic firearm) and the following consecutive

---

[1] Undesignated statutory references are to the Penal Code.

terms: four years on count 3 (dissuading a witness), two years each on counts 1 and 11 (assault with a deadly weapon), one year four months on count 2 (false imprisonment with violence), two years on count 4 (threatening a witness), two years eight months on count 6 (first degree residential robbery), and one year four months each on counts 9 (false imprisonment with violence) and 12 (possession of a firearm by a felon). The trial court also imposed additional time for the enhancements.

DISCUSSION

I

Defendant contends the prosecutor's belated disclosure of C.S.'s 2005 police contact and 2001 misdemeanor conviction merits a new trial under *Brady, supra,* 373 U.S. 83 [10 L.Ed.2d 215].

A

The jury trial began on January 24, 2011. The jury was empanelled that day. The trial was scheduled to resume on January 27, 2011. On January 25, the prosecutor disclosed the fact of a 2005 "police contact" in which C.S.'s name was identified in connection with section 422 (threats of great bodily injury) and section 182, subdivision (a) (conspiracy). The prosecutor also provided the following information in an email: "Cynthia Stewart battered a female. One witness alleged [C.S.] encouraged this. One witness said he did not say anything."

On January 26, 2011, defendant filed a motion to compel discovery, seeking the criminal history records (rap sheets) for all the witnesses the People intended to call at trial. Defendant argued that although the 2005 incident did not result in a criminal charge, it was "particularly relevant" to the defense because it included an allegation of conspiracy. Defendant noted that following the instant crimes, C.S. did not initially mention that there were two other victims. Thus, the prior incident of possible conspiracy could parallel the defense theory in this case that C.S. had recruited others to support his false testimony against defendant. Defense counsel complained that the

6

People were deciding which entries on a witness's rap sheet should be disclosed to the defense.

The prosecutor responded that the government had an obligation to crime victims not to turn over confidential information unless it was relevant to the defense. She said she would be committing a crime herself if she unnecessarily revealed victim information, and she did not believe the 2005 allegations against C.S. constituted discoverable proof of moral turpitude.

The trial court said although the information might be worthy of further investigation, the trial court could not make a finding at that time that the 2005 incident was exculpatory.

Days later, defendant once again demanded disclosure of the rap sheets. The prosecutor gave the court the criminal history records for certain witnesses. Defendant argued that he had been entitled to receive a full criminal history report for every government witness 30 days before trial, including C.S.'s 10-year-old misdemeanor conviction for domestic violence.

The trial court said defendant did not have a right to the criminal history records; he only had a right to felony convictions and exculpatory evidence. The trial court observed that C.S.'s criminal record was not exculpatory and his prior domestic violence conviction was not a felony. Nonetheless, the trial court gave the rap sheets to defense counsel and allowed defense counsel to question C.S. about the circumstances of the prior misdemeanor domestic violence conviction.

On February 3, defendant filed a motion for sanctions based on alleged prosecutorial misconduct. Among other things, the motion asked the trial court to

instruct the jury with CALCRIM NO. 306 as modified[2] and to bar the prosecutor from commenting in closing argument about C.S.'s 2001 misdemeanor domestic violence conviction and 2005 police contact. The trial court granted those requests.

B

"The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material on either guilt or punishment." (*In re Miranda* (2008) 43 Cal.4th 541, 575 [citing *Brady*, *supra*, 373 U.S. at p. 87 [10 L.Ed.2d at p. 218]].) Even if evidence impeaching a key witness for the prosecution is favorable, it is material only if there is a reasonable probability that the trial would have resulted differently if the impeachment information had been disclosed. (*In re Sassounian* (1995) 9 Cal.4th 535, 544-545, citing *United States v. Bagley* (1985) 473 U.S. 667, 681 [87 L.Ed.2d 481, 493-494] [interpreting *Brady*].)

Defendant cites *Kyles v. Whitley* (1995) 514 U.S. 419 [131 L.Ed.2d 490], a case in which the government withheld witness investigation notes that suggested one of the key witnesses might have been the actual perpetrator. (*Id.* at pp. 452-453 [131 L.Ed.2d at pp. 517-518].) *Kyles* involved material, exculpatory evidence; the instant case does not.

The 2005 incident was favorable to defendant because it had a tendency to impeach C.S. Generally speaking, however, favorable impeachment evidence is material in the *Brady* sense only when the witness supplied the only evidence linking the defendant to the crime; it is not material if other evidence corroborates the witness's testimony. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1050, quoting *United States v.*

---

[2] CALCRIM No. 306 describes the statutory obligation to exchange trial information 30 days before trial and permits the jury to draw inferences from the delayed disclosure of specified evidence.

*Petrillo* (2d Cir. 1987) 821 F.2d 85, 90 [interpreting *Brady*].) Here, C.S.'s testimony was corroborated not only by the two other victims, but also by substantial physical evidence.

Even if the prior matters had been material, the prosecutor's late disclosure was not a *Brady* violation because defendant was able to impeach C.S. with that information at trial. (*People v. Verdugo* (2010) 50 Cal.4th 263, 280 [evidence presented at trial is not considered suppressed, whether or not it had previously been disclosed during discovery]; *People v. Morrison* (2004) 34 Cal.4th 698, 715 [same].)

The trial court issued sanctions based on defense counsel's claim that the prosecutor breached a duty to disclose evidence of C.S.'s criminal history 30 days before trial. Section 1054.7, not *Brady,* imposes a 30-day disclosure deadline, and the discovery scheme of section 1054 et seq. does not supersede or alter a defendant's constitutional right to disclosure of exculpatory evidence under *Brady.* (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 378.) Defendant does not assert the violation of statutory discovery rights on appeal. However, because defendant conflated the statutory deadline with *Brady*, we will address the timing of the disclosure.

Under the discovery statute, a prosecuting attorney must disclose, among other things, "[t]he existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial" and "[a]ny exculpatory evidence." (§ 1054.1, subds. (d) & (e).) C.S. had no felony convictions, but defendant claimed C.S.'s 2005 police contact was exculpatory and the parties argued the question extensively. The trial court said C.S.'s criminal record was not exculpatory. In any event, as we explained above, the 2005 incident was not material. (*Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901 ("To prevail on a claim the prosecution violated this duty [of disclosure under *Brady*], defendants challenging a conviction would have to show materiality" even if they were entitled to receive the evidence before trial under section 1054.1.)

Nonetheless, the trial court gave the defense six days to investigate, the longest possible interval to avoid dismissing the jury. In addition to delaying C.S.'s testimony, the trial court ordered the prosecutor to make the police contact witness available and it also allowed defense counsel to prepare a late discovery instruction and gave him an option to delay his opening statement until after the prosecution's case. Although defense counsel acknowledged that the prosecutor had not "intentionally sandbagged" the defense, the trial court agreed to instruct the jury with a modified version of CALCRIM No. 306 and to bar the prosecutor from commenting in closing argument about C.S.'s 2001 misdemeanor domestic violence conviction and 2005 police contact. The trial court's efforts were adequate to address the delayed disclosure.

Moreover, in light of the substantial, corroborated evidence that three victims were tied up in C.S.'s home while defendant ordered C.S.'s face visibly disfigured, we see no reasonable probability that the result of the trial would have been different even if defendant had been able to adduce additional evidence that C.S. had displayed moral turpitude in his interactions with others in the years before the attack.

Defendant further contends that the modified version of CALCRIM No. 306 was fatally flawed because it did not include sufficient guidance on how to evaluate the impact of late disclosure of evidence. But any error in an instruction requested by the defendant is invited error which we will not address. (*People v. Harris* (2008) 43 Cal.4th 1269, 1293.)

## II

Defendant next contends the trial court erred in denying his request for a continuance to secure the testimony of the witness who had made accusations against C.S. in 2005.

On the same day defendant moved to compel discovery about the 2005 police contact, he moved for a continuance to investigate it. The trial court denied the request

10

for a continuance, but ordered the People not to call C.S. until the following week so that defense counsel would have six days following the disclosure to investigate.

In the 2005 incident, C.S. was accused of encouraging his sister to batter a woman named Julie, and then telling Julie he would kill her if he saw her again. In the time permitted for investigation, defense counsel said he spoke to Julie and that she would not be available to testify during trial because she was in the hospital. The prosecutor confirmed Julie had undergone heart surgery that week. Due to her unavailability, the trial court admitted into evidence a transcript of an interview with the hospitalized witness by the prosecution's investigator, recounting Julie's accusations against C.S. Defense counsel was also permitted to question C.S. about the 2005 incident; C.S. admitted knowing that his sister had engaged in what he called a "cat fight" with Julie but denied encouraging the fight or threatening Julie.

Defendant now claims, without citing any evidence, that it was "quite apparent" Julie's testimony would have been available within "a matter of weeks." Defendant argues the burdens to continue the trial were "relatively slight" and paled in comparison to the defendant's constitutional concerns.

The continuance of a criminal trial may be granted only on a showing of good cause. (§ 1050, subd. (e).) On review, we must consider the circumstances of a denied continuance and evaluate whether the denial "was so arbitrary as to deny due process." (*People v. Doolin* (2009) 45 Cal.4th 390, 450.) Absent an abuse of discretion and prejudice, the denial of a continuance does not warrant reversal. (*Ibid*.)

As noted above, there was no *Brady* violation and the continuance was requested after the jury had been sworn. The trial court expressed concern about jeopardy having attached and about the inconvenience of rescheduling the witnesses and the challenge of having counsel and the jury return many weeks later. Nonetheless, the trial court took seriously the claim of potential prejudice to the defense and took numerous steps to rectify the situation.

11

There was no evidence that Julie would have been able to personally appear if a continuance had been granted, and no evidence that her testimony likely would have caused the jury to disbelieve C.S., the other corroborating witnesses, and the physical evidence of C.S.'s missing teeth and knife-scarred face. The trial court's decision to deny the continuance was not arbitrary and did not deny defendant due process.

III

Defendant also contends the prosecutor committed misconduct by commenting on subjects during closing argument that had been previously precluded by the trial court. He claims the prosecutor's closing argument violated his constitutional right to confront witnesses under the Sixth Amendment to the United States Constitution.

The prosecutor began her closing argument by saying: "I come before you today somewhat humbled. I have heard that people who have received honor, dishonor is a much sharper sword. And you heard a . . . jury instruction read by the judge that I didn't disclose evidence in a timely manner. I think[,] in general, that's a somber event for all of us --"

At that point, defense counsel asked to approach the bench and said the point of the trial court's prior sanction for nondisclosure -- ordering the prosecutor not to comment on the 2001 or 2005 incidents from C.S.'s criminal record -- was to prevent the prosecutor from testifying. The trial court told the prosecutor she was heading toward expressing her feeling about jury instructions, but it was not relevant and the trial court did not want her to discuss it. Defense counsel then asked, "what line is she proceeding on." The prosecutor responded, "It's an apology in flowery language."

The prosecutor continued with her closing argument as follows: "We all come here with confidence in our system, and the defendant has a right to have the same confidence in the system as the attorney working very hard on his behalf. And any time there's a little check or chip it affects either one of us."

12

Defense counsel objected, but the trial court overruled the objection and told defense counsel not to interrupt.

The prosecutor continued: "Not just this particular person. We've all heard of a ripple effect, we've all heard of gossip that the general public might latch onto and that undermines our system. Every time somebody loses confidence in the system. So I apologize to all of you and to everyone who helped me with this case as the leader of this particular case. [¶] But especially[] affected, I believe[,] are the witnesses in this case who the jury instructions that the judge read refers to and the jury instruction does say that the effect of the violation on the evidence is up to you. So in the storm of trial is the effect on the evidence --"

Defense counsel objected that the prosecutor was testifying. The trial court responded, "Counsel, we passed this. You may proceed. Do not interrupt."

Continuing with closing argument, the prosecutor said: "Is the effect on the evidence a full blown twister or a drop of rain. I have seen a penny that has been placed on a train track and the result of what happens -- and we're all told not to do that, cause it could derail this monstrous train, this little tiny penny, and the violation could do that. [¶] But I am seeing here also the train as an unstoppable train of truth. What we have here is also an example of confidence in your system, that there is a jury instruction read to you exposing the problem that is a public open system where the truth will act. And at this point I'm going to do the best job I can for the victims of this particular case."

Defense counsel objected that the prosecutor was vouching or making an appeal to sympathy. The trial court overruled the objection, saying the case was not for the victims, the case was for the People and the jury understood that.

Defendant now claims that despite the trial court's sanction order that she not discuss the 2001 or 2005 incidents, the first thing the prosecutor did during her argument was to "segue" into those incidents by mentioning the CALCRIM No. 306 instruction and her delay in disclosure. Defendant argues the prosecutor included information that

13

was not in evidence, such as that she was the "leader" of the case. Defendant claims the prosecutor characterized herself as the "captain of some mighty ship" who had committed a "tiny error" and that "such a peccadillo should not be allowed to harm the army of assistants and victims who had labored so heavily to assist the prosecutor." Defendant claims this was a blatant attempt to sway the jury with an impermissible appeal to sympathy and emotion.

Defendant cites *People v. Bolton* (1979) 23 Cal.3d 208 (*Bolton*) as authority for reversal. In that case, a prosecutor told the jury on closing argument that, "but for certain rules of evidence that shielded appellant, he could show that appellant was a man with a record of prior convictions or with a propensity for wrongful acts." (*Id*. at p. 212, fn. omitted.) Although the California Supreme Court upheld the conviction, it said the prosecutor's statement was improper because it made the prosecutor his own witness not subject to cross-examination. (*Id.* at p. 213.)

The circumstances in this case are distinguishable from *Bolton*. Here, the prosecutor did not imply that compelling evidence had been withheld from the jury. Rather, she apologized for the delayed disclosure.

We conclude there was no prosecutorial misconduct. The prosecutor's statements were argument, not testimony, and they did not violate the trial court's sanction order to avoid discussing the 2001 or 2005 incidents. Moreover, the prosecutor's argument did not employ " 'deceptive or reprehensible methods' " of persuasion. (See *People v. Silva* (2001) 25 Cal.4th 345, 373.)

IV

In addition, defendant claims the trial court committed instructional error. Specifically, he contends the trial court should have instructed the jury on the necessity for unanimity on count 4, which charged a violation of section 140 (threatening a witness).

14

Among other things, section 140, subdivision (a) says it is a crime when a person "willfully uses force or threatens to use force or violence" against a witness. CALCRIM No. 2624 uses similar disjunctive language. The jury heard evidence that defendant's accomplice, Bear, repeatedly kicked C.S., cut C.S.'s face, and told C.S. that Bear had been in prison and in prison they killed "rats." Based on that evidence, defendant claims there were two possible theories under which the jury could have convicted him as an aider and abettor on count 4: based on Bear's use of force, or based on Bear's threat to use force. Defendant argues the trial court had a sua sponte duty to instruct the jury that it had to unanimously agree on one of those theories.[3]

The trial court instructed the jury consistent with CALCRIM No. 2624 as follows: "The defendant is charged in count four with using force against the witness [C.S.]. To prove that the defendant is guilty of this crime, the People must prove that one, [C.S.] and Scott[] gave information to a law enforcement officer in a criminal case. And two, the defendant willfully used force or threatened to use force or violence against [C.S.] because he had given that information."

Defendant contends the potential confusion between the use of actual force and threatened force should have been cured by including an instruction such as CALJIC No. 17.01 or CALCRIM No. 3500, requiring the jury to unanimously agree on which specific act or acts constituted the crime, kicking and cutting C.S. or threatening to kill him.

The Attorney General counters that Bear's comments about killing rats were not threats at all but were merely boasting and posturing. We agree. C.S. testified that Bear

---

[3] Defendant also argues that section 140 violates the federal Constitution's First Amendment. We decline to address the arguments regarding the constitutionality of section 140, however, because the arguments were appended to a different and unrelated contention and were not set out separately as required by California Rules of Court, rule 8.204(a)(1)(B). (*People v. Crosswhite* (2002) 101 Cal.App.4th 494, 502, fn. 5.)

15

said he "killed people like me, he kills rats, he's done time in Folsom and just comments like that." But when Bear made the statement, he had already cut C.S.'s nose and cheek and kicked his teeth out, and defendant had already said, "[t]hat's for ratting on my brother." Nothing in the record indicates that Bear's statement about how retaliation is handled in prison constituted a separate basis for conviction.

Defendant did not offer evidence that he encouraged Bear's taunting but not his kicking and cutting; rather, his defense was that C.S. had fabricated the entire incident and the witnesses had lied. In closing argument, the prosecutor explained to the jury that the count 4 charge involved "helping law enforcement in the past and getting retribution and retaliation inflicted on you" whereas the count 3 charge for dissuading a witness was "trying to keep them from talking to law enforcement in the future about what you just did." The prosecutor said nothing to suggest that Bear's comments about killing rats, standing alone, might have constituted a basis for conviction and there is no evidence to suggest jury confusion.

A jury need not agree on a specific theory of guilt if its conclusion is justified by either of two interpretations of the evidence. (*People v. Milan* (1973) 9 Cal.3d 185, 195 [jury need not agree on alternate murder theories proposed by prosecution so long as each juror is convinced that the defendant is guilty of the offense as defined by statute]; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1199 [unanimity not required on two distinct theories of robbery because defendant denied participating at all]; *People v. Failla* (1966) 64 Cal.2d 560, 569 [jurors need not agree on specific motive to convict on burglary].)

" 'A unanimity instruction is required only if the jurors could otherwise disagree [about] which act a defendant committed and yet convict him of the crime charged.' " (*People v. Beardslee* (1991) 53 Cal.3d 68, 93, quoting *People v. Gonzales* (1983) 141 Cal.App.3d 786, 791 [possibility of disagreement acknowledged where defendant is accused of unrelated incidents such as rapes at different times or places, but not where one victim claimed repeated penetrations and only one count of rape is charged].) In this

16

case, it is difficult to imagine a jury split on whether it was the vicious physical assault or Bear's comments about prison that proved the second element of section 140, particularly where defendant did not refute, distinguish or explain either existentially possible theory except to suggest that the witnesses had lied.

We need not decide the applicability of the "continuous course of conduct" exception to the rule requiring unanimity because we find no rational basis for the jury to have distinguished between two separate and independent theories or acts. The instruction defendant contends should have been offered was designed in part "to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count." (*People v. Deletto* (1983) 147 Cal.App.3d 458, 471-472.) There being nothing in the record to suggest that the jury might have amalgamated evidence in order to reach a guilty verdict, we conclude there was no instructional error.

V

In addition, defendant claims the trial court committed sentencing error. Specifically, he contends (A) certain sentences should have been stayed pursuant to section 654, and (B) certain sentences must be reversed pursuant to the line of cases beginning with *Apprendi*, *supra,* 530 U.S. 466 [147 L.Ed.2d 435].

A

We begin with the contention that certain sentences should have been stayed pursuant to section 654. Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." The California Supreme Court has explained that "the purpose of

17

section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.)

Defendant contends the convictions for assault with a semiautomatic firearm, assault with a knife, false imprisonment with violence, threatening a witness and first degree residential robbery were all part of the same transaction involving C.S. Because the trial court imposed sentence on count 5 (assault with a semiautomatic weapon) as the base term, defendant argues the trial court should have stayed the sentences on count 1 (assault with a deadly weapon, a knife), count 2 (false imprisonment with violence), count 4 (threatening a witness) and count 6 (first degree residential robbery). He claims those consecutive sentences constituted punishment for what was actually a single course of conduct with a single intent and objective, to wit, "to retaliate against [C.S.] for having reported a crime committed by [defendant's] brother against [C.S.]" and "to exact revenge by threatening and harming [C.S.], and by stealing property from him."

To determine whether sentencing for multiple convictions merits a single sentence or multiple sentences, a trial court looks to " 'whether the defendant's criminal intent and objective were single or multiple.' " (*In re Jose P*. (2003) 106 Cal.App.4th 458, 469, quoting *People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.) The criminal objective question is decided by the trial court, whose fact findings we review on appeal for substantial evidence. (*In re Jose P., supra,* 106 Cal.App.4th at p. 469.)

In this case, the trial court said it found a factual basis for each crime and conviction. The trial court further found that defendant was absconding from parole when he entered his relative's home, loaded a semiautomatic firearm while his relative's back was turned, then held three people hostage, and "the rest of the crimes flowed from that." The trial court did not make an explicit finding on what objectives the defendant had in mind after tying up the victims.

Before sentencing, defense counsel asserted that all the crimes against C.S. were part of the single crime of robbery. The trial court heard argument from counsel and

18

thanked the probation department for research on the issue.  In the absence of express findings on the defendant's intent and objective, "a finding that the crimes were divisible is implicit in the judgment" and the appellate court presumes the existence of facts the trial court could reasonably deduce from the evidence.  (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717.)  Multiple crimes are divisible where the defendant had a chance to reflect between offenses and where each offense created a new risk of harm. (*Ibid*.)

We reject defendant's argument focusing on the "apparent intent" for revenge.[4]  A similar argument was rejected in *People v. Surdi* (1995) 35 Cal.App.4th 685, where the defendant argued on appeal that he should have had a single sentence for kidnapping and mayhem because the sole purpose of the kidnapping was to beat the victim.  (*Id.* at p. 688.)  The Court of Appeal upheld multiple sentences because the victim had been stabbed, kicked, strapped around the neck and dragged to a riverbed, allowing the defendant periods of time to reflect.  (*Id.* at pp. 689-690.)  In *People v. Trotter* (1992) 7 Cal.App.4th 363, a trial court imposed consecutive sentences for firing multiple shots at a police car over the course of only a minute or two; upholding the sentence, the appellate court noted that, although the incident was brief, the gunshots were separated by sufficient periods of time for the defendant to reflect and walk away.  (*Id.* at p. 368.)

Here, the course of events gave defendant many opportunities to reflect and walk away.  The crimes began when defendant took possession of the semiautomatic pistol when C.S. walked into the kitchen.  That act, by itself, supports the conviction on count 12, possession of a firearm by a felon.  (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1410 [a violation of former section 12021, subdivision (a) is committed the instant

---

**4**  Appellant's opening brief tells us that, to apply section 654, we "must look to the 'apparent intent' of the defendant" (in this case revenge), citing *In re Culbreth* (1976) 17 Cal.3d 330, 335.  *Culbreth* was overruled by *People v. King* (1993) 5 Cal.4th 59, 79.

the felon in any way has a firearm within his control].) Defendant nonetheless argues that his separate sentence on count 12 was unlawful, citing *People v. Bradford* (1976) 17 Cal.3d 8 (*Bradford*). In *Bradford*, a defendant fleeing a bank robbery was stopped for speeding, grabbed the officer's gun and shot at him. (*Bradford, supra,* 17 Cal.3d at pp. 13, 22.) The court in *Bradford* held that the defendant's possession of the officer's gun was not " 'antecedent and separate' " from his use of the revolver in assaulting the officer, hence it was necessary to stay the sentence for possession. (*Id.* at pp. 22-23.)

In a subsequent case -- *People v. Ratcliff, supra*, 223 Cal.App.3d 1401 -- the Court of Appeal considered *Bradford* and *People v. Venegas* (1970) 10 Cal.App.3d 814, 819-820, in which a defendant apparently wrested a gun from the victim before shooting him. The court in *Ratcliffe* said *Bradford* and *Venegas* demonstrated the principle that if "fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense, section 654 will bar a separate punishment for the possession of the weapon by an ex-felon." (*People v. Ratcliff, supra,* 223 Cal.App.3d at p. 1412.)

We conclude defendant's reliance on *Bradford* is misplaced. Defendant did not forcibly take his victim's weapon in order to subdue the victim; C.S. handed defendant the weapon and turned his back. The trial court reasonably could have inferred that defendant had an opportunity to return the gun as C.S. apparently expected. Rather than returning the gun or setting it down, however, defendant pointed it at C.S.'s dog and at his friends, prompting C.S. to urge him to stop. There was ample evidence for the trial court to conclude that defendant had an opportunity to reflect and walk away after possessing the gun and before committing the other charged crimes.

Gun in hand, defendant next ordered Bear to tie C.S.'s hands, completing the false imprisonment for which the jury convicted defendant on count 2. As defendant trained the semiautomatic pistol on the victims, and as he tied up S.M. and stuck his hand into her pants, Bear attacked C.S., kicking, punching and cutting C.S.'s face with a knife.

20

Defendant put the gun to C.S.'s head and said it was for "ratting" on defendant's brother, Tommy. Those acts supported the convictions for assault with a deadly weapon (count 1), threatening a witness (count 4) and assault with a semiautomatic firearm (count 5). The trial court reasonably could have found that defendant had an opportunity to reflect and walk away after each of those acts.

While the victims remained bound and no doubt fearful, defendant and Bear gathered up guns and other property into a pillow case and garbage bag to take with them, completing the crime on count 6 (first degree residential robbery). Just before leaving, defendant sat on the ground beside C.S., pointed the gun at his head again and said, "The only reason why I'm not killing you is because I love you." Defendant warned C.S. that if C.S. called law enforcement, he would kill C.S.'s mother, sister and nephew, completing the crime on count 3 (dissuading a witness from prosecuting a crime).

We disagree with defendant's argument that on this record, there is a singular motive of vengeance requiring imposition of just one punishment under section 654. (See *People v. Perez* (1979) 23 Cal.3d 545, 550 [rejecting argument that multiple sex crimes should be punished only once because they furthered a single objective of sexual gratification].)

Substantial evidence supports the conclusion that defendant had the opportunity between each of the crimes to stop and walk away. The only crime in this case that might be construed as part of another is the false imprisonment. Tying C.S.'s hands behind his back certainly could have helped facilitate the other crimes. But the trial court could have inferred from the evidence that defendant's objective in tying up C.S. was not just to further the assault or robbery but to humiliate him by sexually touching his girlfriend while both were bound. (See *People v. Nguyen* (1988) 204 Cal.App.3d 181, 190 [attempted murder punished separately from robbery because it was an act of gratuitous violence against a helpless and unresisting victim].) We conclude that substantial

21

evidence supports the trial court's decision to impose separate sentences for each of the offenses involving C.S.

## B

Defendant additionally contends the sentences on counts 1, 2, 4 and 6 must be reversed because they violate his federal constitutional rights described in *Apprendi, supra,* 530 U.S. 466 [147 L.Ed.2d 435] (precluding the imposition of an enhanced sentence for so-called "hate crimes" based on a sentencing judge's postverdict finding that a defendant harbored a statutorily prohibited purpose at the time a crime was committed). The principle of *Apprendi* is that legislative sentence enhancements encroach on the domain of a jury in violation of the Sixth Amendment. (*Oregon v. Ice* (2009) 555 U.S. 160, 168 [172 L.Ed.2d 517, 524].)

Defendant argues that under *Apprendi*, "the jury must find the defendant acted with different objectives or intents, not the trial court." He claims the finding that the defendant acted with different objectives substantially increases the punishment beyond which he is normally exposed. Defendant appears to be arguing that if the trial court does not stay his sentences under section 654 based on a finding that he had different objectives, defendant's punishment is effectively enhanced.

But the decision whether to impose consecutive sentences is not a traditional jury function. *Apprendi* does not control whether a trial court may impose concurrent or consecutive sentences. (*Oregon v. Ice, supra,* 555 U.S. at p. 169 [172 L.Ed.2d at p. 525]; see also *Porter v. Superior Court* (2009) 47 Cal.4th 125, 137.) In addition, section 654 is not a sentence-enhancing statute. It is "a discretionary benefit provided by the Legislature to apply in those limited situations where one's culpability is less than the statutory penalty for one's crimes. Thus, when section 654 is found to apply, it effectively 'reduces' the total sentence otherwise authorized by the jury's verdict." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 270.) In this case, the trial court

22

concluded that stays pursuant to section 654 were not appropriate, and that determination is supported by substantial evidence. Defendant's constitutional rights were not impaired by the imposition of consecutive sentencing.

## VI

Appellate courts may order correction of an abstract of judgment that does not accurately reflect the oral judgment of the sentencing court. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, 188.) Our review of the record discloses clerical errors in the abstract of judgment that require correction. On count 6, defendant was convicted and sentenced for first degree residential robbery in violation of sections 211 and 212.5, subdivision (a); he was not convicted and sentenced for first degree residential burglary. In addition, enhancements were imposed on counts 2, 5 and 9 pursuant to section 12022.5, subdivision (a); there is no subdivision (a)(1) in section 12022.5. And an enhancement was imposed on count 6 pursuant to section 12022.53, subdivision (b); there is no section 120222.53, subdivision (b). We will direct the trial court to make these corrections to the abstract of judgment.

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment as follows:

On count 6, defendant was convicted and sentenced for first degree residential robbery in violation of sections 211 and 212.5, subdivision (a); he was not convicted and sentenced for first degree residential burglary. In addition, enhancements were imposed on counts 2, 5 and 9 pursuant to section 12022.5, subdivision (a); there is no subdivision (a)(1) in section 12022.5. And an enhancement was imposed on count 6 pursuant to section 12022.53, subdivision (b); there is no section 120222.53, subdivision (b).

23

The trial court is further directed to send a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

                                              MAURO                , J.

We concur:

                 ROBIE                , Acting P. J.

                 HOCH                , J.